## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Josiah Swinney
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Christopher Keller,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

July 31, 2020

Court of Appeals Case No.
20A-CR-148

Appeal from the Jefferson Circuit Court

The Honorable Donald J. Mote, Judge

Trial Court Cause No.
39C01-1907-F3-929

**Altice, Judge.**

## Case Summary

Christopher Keller pled guilty to four counts of Level 3 felony aggravated battery. The trial court sentenced Keller the maximum term of sixteen years for each offense and ordered the sentences be served consecutively for a total sentence of sixty-four years. Keller presents two issues for our review:

> 1. Did the trial court abuse its discretion in ordering the sentences be served consecutively?
>
> 2. Is the sentence imposed inappropriate?

We affirm.

## Facts & Procedural History

On May 25, 2019, Kyla Hammons (Mother) left her eighteen-month-old (Child) and ten-month-old sons in the care of Keller, her fiancé,[1] while she went to work. Mother returned home around 11:00 p.m. and both of her children were asleep. The following morning Mother noted that Child was "clingy" and "fussy" when she was out of his sight. *Transcript Vol. II* at 22, 23. Because Child could not talk yet due to his age and no visible injuries had manifested, Mother attributed Child's behavior to the possibility that he might be getting sick.

---

[1] Mother and Keller were married on May 28, 2019.

[4]    On June 7, 2019, Mother again left Child and his infant brother in Keller's care while she went to work. When she arrived home around 11:45 p.m., she looked in and saw Child sleeping in his crib and did not suspect anything out of the ordinary. Around 6:00 a.m. the following morning, Mother went to Child and noticed bruising on his face and a bite mark on his arm that were not present when she left for work the day before. Child cried and winced in pain whenever Mother touched him. As she undressed Child, she discovered that he was "covered head to toe with bruises." *Id*. at 26. She immediately took Child to the local hospital, where he was examined and then referred to Riley Hospital for Children. An examination of Child revealed that he had suffered four compression fractures to his spine; two possible additional backbone fractures; elevated liver enzymes indicating a liver injury; an injury under his tongue; missing patches of hair on both sides of his head; bruising on his right collar bone, back, left ear, thighs, knees, shins, calves, and feet; patterned bruising (in the shape of a circle) to his upper left arm; "significant bruising" to his forehead, left cheek, nose, and under both eyes as well as to his right forearm; and scratches over his hands and feet. *Exhibit Volume* at 38.

[5]    While at the hospital, Mother texted Keller about Child's injuries and Keller suggested that his two-year-old daughter inflicted the injuries on Child during normal toddler play. When Mother sent him a picture of the bite mark on Child's arm, Keller explained that his daughter bit Child and that he "smacked" her and "busted her mouth open" and "made her lip bleed." *Id*. at 20, 18, 19. Keller then texted Mother, "yeah ok bitch I didn't touch your dumbass little

slow learning crying ass child" and "bitch once again I have video with me and the kids so f*ck you go die or kill yourself I would love for you to do that one more if you killed yourself nice and slowly." *Id*. at 21. He also sent a message to Mother that he "DIDN'T TOUCH HIT KICK SMACK PUNCH OR BITE YOUR CHILD…..[CHILD] GOT HIS ASS HANDED TO HIM BY A 2 YEAR OLD GIRL." *Id*. at 23 (capitalization in original). He continued in another text that "if I lose my daughters or I go to jail because of you I swear on everything I love in this world I will make every waking day of your life a living hell I swear I didn't touch [Child]." *Id*. at 25.

[6] On July 25, 2019, the State charged Keller with two Level 3 felonies for battery on a child under fourteen years of age and neglect of a dependent. At some point thereafter, police were notified about a memory card from a surveillance system inside Keller's home that was found under the mattress in his bedroom. Police secured the memory card pursuant to a warrant and discovered that it contained a video of Keller abusing Child.[2] The video was date stamped May 25, 2019.

[7] Based on the content of the video, on August 9, 2019, the State amended the charging information to include a charge of attempted murder and sixty-eight other counts of aggravated battery, battery, neglect, contributing to the delinquency of a minor, and reckless supervision of a minor as Level 3, Level 5,

---

[2] When police recovered the memory card, they learned that the surveillance system had been removed from Keller's home.

and Level 6 felonies. On December 18, 2019, Keller pled guilty to four counts of aggravated battery as Level 3 felonies in exchange for dismissal of the remaining charges.[3] Sentencing was left open to the court's discretion. The court held a sentencing hearing the same day.

[8] The presentence investigation report showed that Keller had three prior felony convictions, seven prior misdemeanor convictions, and that Keller was on probation at the time of the instant offenses. Of his prior convictions, in 2014, Keller pled guilty to domestic battery in the presence of a child less than sixteen years old as a Class D felony and strangulation as a Class D felony in a case where he was also charged with battery resulting in bodily injury to a pregnant woman. Regarding the current offenses, Keller reported that he was under the influence of methamphetamine, heroin, Subutex, and "Flocka". *Appendix Vol. Two* at 144.

[9] During the sentencing hearing, the State played excerpts from the video of Keller's abuse of Child. The video begins with Keller repeatedly shoving Child into the crease of a couch until he became quiet and then forcefully slapping Child in the back of the head. Keller then directed his two-year-old daughter to jump on Child and as she was jumping on Child's legs, Keller picked her up and threw her on Child's head. Less than a minute later, Keller torments Child

---

[3] The time stamp on the video showed that the offenses to which Keller pled guilty occurred at 10:53 a.m., 3:11 p.m., 5:46 p.m., and 7:10 p.m. Thus, the time periods that elapsed between the acts were 4 hours 18 minutes; 2 hours 35 minutes; and 1 hour 24 minutes.

by muttering in his face and then striking him about the head numerous times with his hand. Keller then placed Child in a smothering headlock for approximately forty seconds. He allowed only Child's squirming legs to escape the weight of his body. As Keller walked away, he shoved Child's face into the couch cushion. About a minute passed and then Keller put Child in another headlock for about thirty seconds, during which Child's squirming legs were visible. Keller again encouraged his young daughter to jump on Child as he lay crying. Keller then resumed his smothering of Child as Child struggled to free himself. Keller walked away from Child but returned about thirty seconds later, picked up Child, and body slammed him into the couch, keeping his weight on Child for about fifteen seconds as Child struggled beneath him.

[10] About an hour later, Keller repeatedly punched Child's bottom with the palm of his hand before transitioning to violent thrusts to Child's lower back as Child was lying face down on the couch. The thrusts were so forceful as to cause Child to bounce about a foot in the air. Before walking away, Keller repeatedly slapped Child's feet. About three minutes later, Keller is seen holding Child but as he does, he presses Child's face into his body.

[11] About four hours later Keller held Child parallel to the ground and dropped him about two feet onto a blanket. Five minutes later he slapped Child in the mouth and then kicked him with enough force to cause Child to slide several feet across the floor. Within the next hour, Keller carried Child by his ankles before throwing him on the couch and repeatedly encouraged his daughter to "[g]et him." *Exhibit 17.* Keller also placed Child on top of a couch cushion that

was on the floor but standing on its side and forced Child to fall forward and hit the floor headfirst. Keller then jumped on Child—knees first—as his daughter smothered Child's head with a pillow. About fifteen seconds after Keller removed his weight from Child, Keller forcefully tackled Child.

[12] Keller placed Child on top of the inverted couch cushion again and pushed Child to the floor. He did this numerous times and during one instance, Child's neck appears to snap backward. As Child was lying face up on the floor, Keller smothered Child with a pillow and then jumped on the pillow with all his weight, hitting Child's feet as he squirmed under him. Keller got up and yelled at Child to "get the f*ck up." *Id*.

[13] While Keller changed Child's diaper, he pinched Child's penis and yelled at him to "Quit!" *Id*. He then used the palm of his hand to apply pressure to Child's anus and placed the soiled side of the diaper on Child's face and pushed it down. After he placed a fresh diaper on Child, Keller used the back of his hand to strike Child six times on his penis. Keller continued to hover over Child and sat his laughing daughter on Child's face. Keller placed his face next to Child's and repeatedly screamed, "She got you!" *Id*. Child responded by lying silently on the floor. Keller then thrust his elbow into the side of Child's neck as his daughter hung on his other arm. Keller and his daughter then sat on Child with all their weight for about thirty seconds. About a minute later, Keller smacked Child in the face and threw him on the couch. Child then endured thirteen strikes by a pillow and each time Keller wound up and hit

Child with all his might. Keller then drug Child to another part of the couch by his hair.

[14] Over an hour later, Keller returned to body-slamming Child, and he smacked Child five times. When Child continued to cry, Keller picked him up and smacked his bottom twenty-six times. About thirty minutes later, Keller allowed Child to fall from his knee face first into the floor, began texting, and then smacked Child a few more times. Keller forced Child to stand up and as he picked up Child, he growled at him, let him fall back to the floor, and then growled at him again. Keller continued by bouncing Child on his knee while he hopped around on his other leg, grimacing to show his increased effort. Keller also placed a couch cushion on top of Child and then sat on the cushion.

[15] The State suggested that given the date stamp and the fact that some of Child's injuries were not explained by Keller's conduct as depicted in the video, that Keller abused Child on May 25 and again when Child was in his care on June 7. Because there was no video from June 7, Detective Yancy Denning of the Jefferson County Sheriff's Department testified that "[u]nfortunately" it was impossible to know "what happened to cause" the injuries Child presented with on June 8, 2019. *Transcript Vol. II* at 42.

[16] Dr. Lucinda Woodward also testified at the sentencing hearing. She informed the court that Child now experiences post-traumatic stress disorder, nightmares, fear of strangers, and fear of baths. Dr. Woodward also explained that Child now exhibits "verbal delays" which suggests he is "on a path for

neurobiological damage, long-term consequences." *Id*. at 47. The State also submitted a letter from Dr. Cortney Demetris, a child abuse pediatrician at Riley. Dr. Demetris reviewed the video and noted that "the video clips revealed horrific repeated severe unprovoked physical abuse" of Child that was "life threatening." *Exhibit Vol.* at 39. She concluded, stating:

> There are not words to express in full the pain and suffering experienced by [Child] during the many hours in which he was tortured and beaten by [Keller]. [Child] is witnessed to be crying at times, withdrawn at times, and even possibly unconscious briefly at various times. He was at substantial risk for death during many of the video clips including those of suffocation, repeated impact to his head, repeated forces applied about his neck resulting in dangerous neck positions, and other traumatic forces applied about his body including those that resulted in his compression fractures of the backbones. In the more than 15 years I have been evaluating children who are victims of child abuse, including hundreds of cases of severe physical abuse, this case stands out as one of the most severe.

*Id*. at 40.

[17] In its written sentencing order, the court noted that the video supported the conclusion that Keller "made a series of decisions over an entire day, thinking of novel ways to inflict harm to [Child]." *Appendix Vol. Two* at 241. The court also set out the aggravating and mitigating circumstances it identified during the sentencing hearing. In its oral sentencing statement, the court addressed each proffered mitigator and aggravator as follows:

With respect to the undue hardship on the dependents, the Court rejects this argument. The Court credits the State's argument that the undue hardship is not supported by the record. In fact, the Court demonstrates that [Keller] began using his daughter . . . as an instrument to batter [Child] at the beginning of the day, gradually encouraging the child – encouraging the child to harm [Child]. I have noted at 10:52 in the video he's instructing her to step on [Child]. At 15:08 he's instructing [his daughter] repeatedly to "Get him, . . . . Get him." By the end of the evening, it appears from the video clearly that [Keller's daughter] is assaulting [Child] without any prompting. At 19:20 she's sitting on him casually watching cartoons. She body tackles [Child] at 19:23, and she shoves [Child] to the floor at 19:24. [Keller] chose not to intervene. I won't go so far as to say that Mr. Keller's children are better off . . . and the hardship will be significant, but I cannot conclude that it's undue. The Court gives very little weight to remorse. The Court credits the State's argument that the communications made to [M]other at the time that [Keller] was confronted with the injuries to [Child] were shockingly indifferent. In fact he . . . went on the offensive, encouraging suicide and even making threats to her that he would make her life miserable. The Court gives in terms of accepting responsibility with his plea of guilty – the Court affords [Keller] little weight. The offenses that he's plead [sic] guilty to are on high definition video, and the Court sees his plea of guilty more of a pragmatic decision than an acceptance of responsibility. As to drug addiction, the Court . . . gives this factor zero weight. If you credit [Keller]'s version, he was caring for his daughter and [Mother]'s two boys under the influence of methamphetamine, Subutex, heroin and (inaudible) and this is exactly the reason why a trial court would restrict parenting time in a CHINS case for parents who are inactive [sic] addiction, and again that's if the Court credits this version. But what the video supports is in fact a calculated series of decision[s] over an entire day. It appeared to me that . . . Keller was basically trying to think up new ways – he was looking up in the sky kind of pondering what new and novel ways he could use to harm

[Child]. The Court also finds that he was offered treatment at least one time in October 2014 . . . . Regarding the aggravators, the Court finds the harm, injury damage and loss – I'll say loss because . . . we don't know what necessarily the future holds for [Child], but that it was significant and greater than the elements necessary to prove the commission of the offense. Compelling to this Court was [Mother's] testimony that she couldn't even touch [Child] without him wincing. He has night terrors. He wouldn't even sit for a bath which is a treasured time for any parent and a treasured time for any child. To be in a warm bath should be a place of safety with your . . . parent, and the Court finds that . . . it's very troubling to the Court. And also the fact that [Child] won't sleep on his back. The Court is very troubled by that. Sleeping on your back demonstrates submission. It demonstrates safety. It demonstrates your [sic] okay with your environment, so you're willing to lay supine, prone on – on your bed and you're not afraid of anything, and [Child] is the opposite of that. He's – he's always looking around the corner worried about what's coming now. The trauma that was described by Dr. Woodward was also significant, the medical intervention, the brain scan and the harm that that caused on [Child] and then not only that but this sort of twisted irony that – that even Mr. Keller's incarceration is going to cause pain to [Child]. It's difficult for this Court to – to reconcile that to know that [Child] loves Mr. Keller and will now be in pain – further pain with the idea that he's facing incarceration. The Court finds another – the other – an additional statutory aggravator, his criminal history. [Keller] has, by my count, ten prior convictions over the course of . . . 2003 to 2018, so fifteen years . . . . [T]he Court sees Mr. Keller as having been given ten chances to sort of figure things out, and the other thing that's striking to the Court is that according to the Pre-Sentence Investigation Mr. Keller was afforded leniency time and time and time again. . . . I saw so many times where he was offered time-served sentences and received probation, and he chose to turn his back on all of those things . . . and this demonstrates to the Court that he is not a good candidate for community supervision. The statutory

aggravator that the victim was less than 12 is clearly in the record. [Child] was 17 months at the time. He was on this planet 537 days not including the time that he spent in his mother's womb, and that is a horrible begin[ning to] your life. [Keller] committed these crimes in the physical presence of a child less than 18. His two-year old daughter was present, not only present but recruited by [Keller] to continue on with the assaults on [C]hild, and the Court also recognizes [Child]'s baby brother was present at the time of these assaults. [Keller] was on probation at the time of this offense. He admitted, and again if you credit that version in the Pre-Sentence Investigation, he admitted to using four different hard drugs at the time of this offense while he's on probation. It doesn't seem that anything really mattered. The probation terms before – it's confusing to this Court and the message is clear – will be clear for Mr. Keller that probation is a privilege. We're offering serves [sic] to you to remove barriers, to intervene, to help you, to figure out what the trouble is so that we as a community come together and try to fix the problems. That's what probation is, and when you violation [sic] probation this Court sees that as . . . significant and will . . . hold you accountable. [Keller] had care and custody or control over [C]hild at the time of the offense. Mom leaves her baby boys in your care so she could go to work . . . . You think about all the single parents out there that don't have that option, but she left the boys in your care so she could go to work, and she trusted you, and we all trusted you with those babies, and you violated that trust in what the Court sees as an unimaginable way. The non-statutory aggravator the Court finds is the nature and circumstances in this case are particularly troubling. Using a full – the full weight and strength that you had, your delivering blows to this 17-month old baby knocking him down, holding him above your head by the thighs causing him to arch his back which had to be extremely painful, balancing him . . . on your thigh, bouncing him violently. That had to strike his genitals on more than one occasion, and that had to be tremendously painful. I saw at 14:39 while you were changing his diaper that you pinched his penis in a way that harmed him and caused him

to cry out.  That was not lost on this Court.  I saw also that at a different time it appeared to this Court that you forced your finger into – inside [C]hild while you're wiping his bottom because he cried out as you did that, using an arm bar on his neck, screaming at him nose-to-nose repeatedly, and what the Court struggled with today, not that any of it was really something to tolerate, but screaming the song "Itsy Bitsy Spider" at this baby . . . was just a lot.  The Court finds that the aggravating circumstances by far outweigh any mitigation presented before the Court today.  The Court will sentence [Keller] to 16 years [on each count].  The Court finds that these offenses are accepted [sic] from the episode of criminal conduct's statute.  For each bone that you broke in that baby's body, you will serve four – four sixteen-year sentences consecutive for a term of 64 years executed at the Indiana Department of Correction with none suspended.

*Transcript Vol. II* at 60-63.  Keller now appeals.

# Discussion & Decision

[18]     Keller argues that the trial court abused its discretion in imposing consecutive sentences without properly articulating why such was appropriate.  Keller further argues that "the imposition of consecutive sentences added to maximum sentences on each offense resulted in a sentence so harsh it became inappropriate."  *Appellant's Brief* at 12.  Keller asks this court to reduce his

sentence by ordering that the maximum sentence on each offense[4] be served concurrently for a total term of sixteen years.

### 1. Consecutive Sentences

[19] Sentencing decisions, including the decision to impose consecutive sentences, are matters left to the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490, *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007); *Gilliam v. State*, 901 N.E.2d 72, 74 (Ind. Ct. App. 2009). On appeal, we review a trial court's sentencing order only for an abuse of discretion. *Id.* It is an abuse of discretion if the trial court's "decision is 'clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.'" *Id.* (quoting *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006)).

[20] A single aggravating circumstance may support the imposition of consecutive sentences. *Lavoie v. State*, 903 N.E.2d 135, 140 (Ind. Ct. App. 2009). Although a trial court is required to state its reasons for imposing consecutive sentences, it may rely on the same reasons to impose a maximum sentence and consecutive sentences. *Id.*

[21] Keller argues that the trial court's sentencing statement did not adequately explain why consecutive sentences were warranted. We disagree. We begin by

---

[4] "A person who commits a Level 3 felony (for a crime committed after June 30, 2014) shall be imprisoned for a fixed term of between three (3) and sixteen (16) years, with the advisory sentence being nine (9) years." Ind. Code § 35-50-2-5(b).

noting that the State argued that consecutive sentences were warranted because the offenses to which Keller pled guilty were "separated" in time in that they were "hours apart." *Transcript Vol. II* at 59. In its oral sentencing statement, the court recognized the prolonged timeframe in which Keller abused Child and that his actions appeared "calculated" and that he was "basically trying to think up new ways . . . he could use to harm [Child]." *Id.* at 61. In addition, the trial court provided a very thorough and comprehensive sentencing statement, describing in detail the appalling, unprovoked abuse Child suffered at the hands of Keller that was depicted in the video. The court carefully addressed each proffered mitigating and aggravating circumstance and found that the aggravating circumstances "far outweigh[ed]" the mitigating circumstances. *Transcript Vol. II* at 63. Additionally, the court found that the nature and circumstances of this case were "particularly troubling" and then described several heinous acts portrayed in the video. *Id.* Further, implicit in the court's sentencing statement is its recognition that the abuse underlying the offenses to which Keller pled guilty occurred at separate times throughout the day. It is clear from our review of the court's sentencing statement that it justified imposition of consecutive sentences not just as punishment "[f]or each bone that [Keller] broke in that baby's body" but for the horrific, senseless, and repeated abuse that Keller inflicted on an innocent seventeen-month-old child. *Id.* We cannot say that the trial court abused its discretion in ordering the sentences be served consecutively.

## 2. Inappropriate Sentence

[22] Keller argues that imposition of the maximum, consecutive sentences for an aggregate term of sixty-four years renders his sentence inappropriate. He notes that the sentence he received is one year less than the maximum sentence for murder.[5] *See* Ind. Code § 35-50-2-3 (providing that the sentencing range for murder is between forty-five and sixty-five years). Keller also compares his aggregate sentence to others who received similar sentences for what he describes as "worse" crimes involving fatal injuries as demonstrating that his sentence is inappropriate. *Appellant's Brief* at 20.

[23] Pursuant to Ind. Appellate Rule 7(B), we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Our Supreme Court has explained that our principal role should be to attempt to leaven the outliers, "not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). "'[W]e must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a

---

[5] Keller also argues that had his offenses not been crimes of violence, his sentence could not have exceeded twenty years as they were part of a single episode of criminal conduct. *See* I.C. § 35-50-1-2(c), (d)(4) (providing that, except for crimes of violence, the total of consecutive terms of imprisonment for felony convictions arising out of an episode of criminal conduct may not exceed twenty years if the most serious crime for which the defendant is sentenced is a Level 3 felony). His crimes, however, are identified as crimes of violence. Thus, this argument has no merit.

trial court brings to its sentencing decisions.'" *Rogers v. State*, 878 N.E.2d 269, 275 (Ind. Ct. App. 2007) (quoting *Stewart v. State*, 866 N.E.2d 858, 866 (Ind. Ct. App. 2007)), *trans. denied*. "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). Whether we regard a sentence as inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224.

[24] Regarding Keller's character, we note that he has a criminal history that includes convictions for battery and strangulation. Keller also admitted to using four different drugs while he was charged with the care of his two-year-old daughter and his fiancé's two young children. As he abused Child, he encouraged his two-year-old daughter to participate. After being confronted with the injuries to Child, Keller encouraged Mother (his wife at the time) to kill herself and threatened to make her life miserable. We find no compelling evidence in the record that casts Keller's character in a positive light.

[25] Regarding the nature of the offense, we find that Keller's abuse of a seventeen-month-old child was despicable and alarming. In the video excerpts submitted during the sentencing hearing, Keller is seen repeatedly smothering, hitting, kicking, pushing, and tackling Child with the full weight of his body and he encourages his young daughter to participate in the abuse. Keller's abuse of

Child began first thing in the morning and continued on and off over a period of approximately ten hours. The abuse is not easy to watch, and it is shocking that Child did not suffer more severe injuries. In addition to the physical injuries, which included at least four fractures to his back, Dr. Woodward testified that Child now experiences, among other things, post-traumatic stress disorder, nightmares, and "verbal delays" that suggest he is "on a path for neurobiological damage, long-term consequences" that could impact how he matures and interacts with others as he grows older. *Id*. at 47. Although Keller did not inflict fatal injuries on Child, the impact of Keller's abuse will be life-long. The nature of the offense is brutal, and Keller showed no restraint or regard for Child.

[26] In short, we do not find Keller's sentence to be inappropriate in light of his character and the nature of the offense.

[27] Judgment affirmed.

Bailey, J. and Crone, J., concur.